

P.O. Box 92628
Southlake, TX 76092
Phone: (817) 749-1705
Fax:      (817) 749-1702

Russell J. Kendzior
russ@tractionexperts.com

June 25, 2018

Mr. Darren Rousso
The Rousso Law Firm
9350 South Dixie Highway Suite. 1520
Miami, FL 33156

**Re: Peggy Noftz vs. Holiday CVS, LLC., d/b/a CVS Pharmacy #476**

Dear Mr. Rousso;

Please accept the following as my report as it relates to the above captioned case. In preparing this report I have read the letter to the Defendant by the law firm of Darren J. Mr. Rousso dated November 16, 2016, the Deposition of Ms. Peggy Noftz (Plaintiff) and, the Plaintiff's Answers to Defendant's First Set of Interrogatories to Plaintiff. I have also reviewed the State of Florida's Department of Agriculture and Consumer Services Division of Food Safety Food Safety Inspection Report dated December 26, 2015, the U.S. FDA Public Food Code (2013), the Defendant's store surveillance video depicting Ms. Noftz's slip and fall event along with photographs of the location where Ms. Noftz slipped and fell. I am awaiting the Deposition transcript from the Defendant's store manager Mr. Ron Bennett and reserve the right to amend this report upon receipt.

## Background

Based on Ms. Noftz's deposition testimony it is my understanding that on October 30, 2016 Ms. Noftz was an invited guest of the Defendant's CVS retail store #4799 which is located at 2105 13th Street in St. Cloud, Florida.  As Ms. Noftz was walking along the aisle adjacent to the refrigerated milk display she slipped on a "milky" liquid substance which was on the floor which caused her to fall and in-turn break her leg.  Ms. Noftz was walking at a normal pace prior to engaging the spilled liquid and was unaware that such liquid was present in advance of her fall. It is my further understanding that there were no warning signs posted at or near the location of Ms. Noftz's slip-and-fall event.

The floor inside the cooler was made of concrete while the floor outside of the cooler was made of polished Vinyl Composition Tile (VCT). Ms. Noftz had previously stepped on moisture located within the cooler and did not slip. She later returned to the milk cooler and slipped and fell on moisture located on the exterior VCT. Ms. Noftz was wearing a pair of flip-flops at the time of her fall which were in good condition.

## Nationally Recognized Industry Consensus Standards

The American Society of Testing and Materials (ASTM) F-1637-13 entitled "Standard Practice for Safe Walking Surfaces" (enclosed) describes the standard of care by which users of floors are to be used and maintained. Listed below are the sections of the ASTM F-1637-09 standard, which I believe are relevant in this case.

Exhibit "B"

DEPOSITION EXHIBIT
C
Kendzior, 2/27/19

Section 5.1.3 requires that: *"Walkway surfaces shall be slip resistant under expected environmental conditions and use."*

Section 5.1.4 states that: *"Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use."*

Section 5.4 *"Mats and Runners"*: Sub-section 5.4.1 states that: *"Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather."*

Section 5.4.3 requires that: *"Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations."*

The American National Standards Institute (ANSI) has a published standard number entitled A1264.2-2012 "American National Standard for the Provision of Slip Resistance on Walking/Working Surfaces" which is was in effect at the time of Ms. Noftz's slip-and-fall event.

Section 7. *"Floor Mats and Runners"* Sub-section 7.1 *"Location"* requires that: *"Floor mats and/or runners or other appropriate methods, shall be at building entries and in areas where it may be foreseen that operations may encounter contaminants on floor surfaces that are not considered sufficiently slip resistant."*

Section 8. *"Housekeeping"*, Sub-section 8.1 *"General"* requires that: *"A housekeeping program shall be implemented to maintain safe walking-working surfaces. E8.1 A written housekeeping program is recommended to ensure consistency and quality. The program should describe materials, equipment, scheduling, methods, and training of those conducting housekeeping."*

Section 8.4 *"Supervision"* states that: *"The housekeeping conditions shall be monitored and a person(s) shall be authorized to promptly initiate corrective action(s).*

Sub-section 8.4.1 states that: *"Monitoring of areas shall include:*
    *a. Inspecting all walking surfaces;*
    *b. Promptly notifying persons responsible for cleanup of affected conditions;*
    *c. Placing signage, barriers or personnel until cleanup is complete."*

Section 9. *"Warnings"* Sub-section 9.1 *"General"* requires that: *"A warning shall be provided whenever a slip/fall hazard has been identified until appropriate corrections can be made of the area barricaded. E9.1 Slip/trip hazards should be eliminated by design and arrangement of possible. The next priority is to guard the hazard if possible, and the last priority is to warn of a hazard. The intent is to eliminate and/or reduce, as much as possible, the potential for injury*

The above-named standards emphasize the importance of protecting pedestrians from slip hazards presented by improper housekeeping, supervision, and warnings and serves as the standard of care for the retail industry.

**Opinions**

It is my opinion that the Defendant failed to properly maintain, inspect, and safeguard the aisle in question and in failing to do such, exposed Ms. Noftz to an un-necessary and otherwise preventable slip hazard.

2

In her deposition Ms. Noftz described her slip and fall event as: "*Yeah. Parked the car, got in. Walked in the store, grabbed a cart, walked over to the coolers where they keep the milk and that, and opened up the door to the cooler, and kind of noticed the floor was a little wet, but that the shelving was pushed back like a good two feet. I mean, you had to step in and reach to get the milk and that stuff. So, the floor seemed a little wet, but I went ahead and stepped in and got the milk. Put it in the cart. I walked over to get the Coke products, put them in the cart, and back to get my husband's pills, but noticed that I didn't have my debit card, so I just turned around. I was going to leave the cart in the middle of the floor, but I didn't want to leave the milk sitting out, because I didn't want it getting warm and then somebody just putting it back in the cooler, and then, you know, that just takes down the date on the milk. And as I stepped back to open up the cooler door, my foot slipped basically in the same spot that I came out of and that. And then I felt my leg twist, and as I was going down, I I just yelled for somebody to call 911; that I had broke my leg, and then I fell to the floor.*" Ms. Noftz further stated that: "*the floor was wet "in front of the cart. Like could have been like condensation or, you know, maybe, you know sometimes the milk leaks and the stuff.*"

Slip and fall accidents are a leading cause of guest injuries in the retail store industry, and although the Vinyl Composition Tile (VCT) floor as used at the CVS's store in question is customarily in the retail industry, such flooring material must remain dry at all times and presents a significant slip hazard when wet. It is also the industry standard to immediately correct any known hazards once they have been identified. To ensure that their floors are always safe, retailers publish both safety policies and procedures as well as employee training guides which call for timely and frequent floor inspections, spill cleanup, and details the overall importance of preventing slips and falls. Unfortunately, at this time I have not been provided the Defendant's safety policies and procedures nor any training materials and therefore cannot affirm that the Defendant has such documents.

Based on the evidence provided to me at this time it appears that the Defendant was aware that the floor both inside and outside of their refrigerated display cases would frequently become wet from a leaking merchandise (ie: milk) and or condensation but failed to take the necessary steps to ensure that such potential slip hazards be contained and or prevented.

Ms. Noftz stated that the milk display rack was pushed back approximately two feet in the refrigerator and required that she step into the cooler to retrieve a milk container. Such practice is uncommon and unsafe. The milk rack should not have been pushed back into the refrigerator but rather pulled forward as to not require customers to enter the refrigerator where spilled milk or other moisture may be present. The Defendant knew, or should have known, that the floor both inside and in front of the refrigerated display may from time to time become wet due to spilled milk or condensation and therefore were on notice as to the increased likelihood that the floor in that area has a greater likelihood of being wet than that of aisles where liquids are not merchandised. However, knowing of the elevated slip risk of a spilled liquid (ie: milk) the Defendant should have inspected the area in and in front of their refrigerated displays more frequently as to ensure that they were safe and dry.

The Florida Department of Agriculture and Consumer Services Division of Food Safety Food Safety Inspection Report stated that "Floor in walk in cooler has build up of spills and debris." Such "build up" is a direct violation of section 6-501.12 and 6-501.13 "Cleaning, Frequency and Restrictions" of the U.S. FDA Public Health Code. This documented call for corrective action by the health department was dated December 28, 2015 nearly one year prior to Ms. Noftz's slip

3

and fall event. Therefore, spilled milk may have been a chronic problem known by the Defendant which demanded their attention and remediation.

Also, given the likelihood that milk and or condensation may accumulate in front of their refrigerated displays the Defendant should have used an appropriate type of floor matting in front of the refrigerators as to absorb/contain spilled liquids (ie: milk) which from time to time accumulate in front of the refrigerators as to cause a potential slip hazard.

Another failure on the part of the Defendant CVS was their failure to adequately warn Ms. Noftz as to the impending wet floor hazard. Because caution signs were not posted at or near the location where Ms. Noftz slipped and fell, Ms. Noftz was not adequately warned as to the impending slip hazard.

It is my opinion that the Defendant failed to meet the nationally recognized industry standards listed above and in doing so, allowed an otherwise known wet floor hazard to exist thus exposing their customers to a potential slip-and-fall event. Had the Defendants addressed the above-mentioned walkway hazard prior to Ms. Noftz visit, it is unlikely that she would have slipped and fallen, and in-turn injured herself. It is therefore my conclusion that the Defendant CVS failed to provide a reasonably safe walkway and therefore failed in their duty to protect their invited guests from un-necessary harm caused by a hazardous walkway and was directly responsible for Ms. Noftz's injuries. I reserve the right to amend my opinions as new information may be presented to me in the future.

Regards,

Russell J. Kendzior, WACH, RAS
President

.encl

4



Designation: F1637 − 13

An American National Standard

# Standard Practice for Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon ($\varepsilon$) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]
F1646 Terminology Relating to Safety and Traction for Footwear

## 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:
3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,
3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway,
3.1.14 Walkway surface hardware, and

## 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

## 5. Walkway Surfaces

5.1 *General:*
5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.
5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.
5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.
5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*
5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.
5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)
5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).
5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

---

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.
Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959. United States

Copyright by ASTM Int'l (all rights reserved); Wed Sep 11 09:56:56 EDT 2013
Downloaded/printed by
Russell Kendzior (NFSI) pursuant to License Agreement. No further reproductions authorized.

F1637 – 13



FIG. 1 Changes in Levels up to a Maximum of ¼ in. (6 mm)

5.3 *Carpet:*

5.3.1 Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2 Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3 Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4 Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

5.4 *Mats and Runners:*

5.4.1 Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2 Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3 Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4 Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5 Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6 Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

5.5 *Illumination:*

5.5.1 Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2 Illumination shall be designed to be glare free.

5.5.3 Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4 Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6 *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

5.7 *Exterior Walkways:*

5.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1 Exterior walkways shall be slip resistant.

5.7.1.2 Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3 Edges of sidewalk joints shall be rounded.

## 6. Walking Surface Hardware

6.1 Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2 Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3 Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

## 7. Stairs

7.1 *General:*

7.1.1 Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2 Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3 Doors shall not open over stairs.

7.1.4 Structure (reserved).

7.2 *Short Flight Stairs (Three or Fewer Risers):*

7.2.1 Short flight stairs shall be avoided where possible.

7.2.2 In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

Copyright by ASTM Int'l (all rights reserved); Wed Sep 11 09:56:56 EDT 2013
Downloaded/printed by
Russell Kendzior (NFSI) pursuant to License Agreement. No further reproductions authorized.

2



F1637 – 13

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian **CAUTION** signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).