UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:17cv1638-ORL-31tbs

PEGGY NOFTZ,

        Plaintiff,

vs.

HOLIDAY CVS LLC,

        Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, RUSSEL KENDZIOR**

Plaintiff, Peggy Noftz, by and through undersigned counsel, hereby responds in opposition to Defendant's Daubert Motion to Exclude the Testimony of Plaintiff's Designated Expert Witness Russel J. Kendzior [D.E. 90] (hereinafter, "Motion to Exclude Kendzior"), and states as follows:

## SUMMARY OF ARGUMENT

1. This action stems from an incident wherein Plaintiff, PEGGY NOFTZ, suffered severe and debilitating injuries when she slipped and fell at Defendant's CVS store located in Kissimmee, Florida.

2. In terms of liability, at issue in this case is the existence and tracking of contaminants. Specifically, it is Plaintiff's contention that she slipped and fell as a result of moisture and other contaminants which were regularly present on the floor of Defendant's walk-in cooler, which moisture and contaminants were then tracked onto the adjacent store floor by the customers and workers who regularly accessed the walk-in cooler.

3. Plaintiff has retained Mr. Russel Kendzior as her liability expert, who is incontrovertibly

one of the world's most highly qualified and respected slip / trip and fall experts. Specifically, Mr. Kendzior is the founder and president of the National Floor Safety Institute (NFSI), a non-for-profit organization that, among a myriad other of activities, authors the preeminent Federal standards for slip and fall prevention promulgated by the American National Standards Institute (ANSI). In addition to his work with NFSI, Mr. Kendzior, through his company Traction Experts Inc., has, for the past 25 years, served as an expert witness and consultant in approximately 800 cases specifically involving slip / trip and falls, has been deposed in approximately 400-500 of these cases, and has testified at trial, inclusive of cases in Federal Court, approximately 40-50 times. (Kendzior, p. 19, lines 8-24). Additionally, Mr. Kendzior serves as the Committee Secretary of the NFSI B101 Committee on "Safety Requirements for Slip, Trip and Fall Prevention", is a member of nine ASTM International committees (a preeminent organization which promulgates international standards for a host of issues, including but not limited to standards for maintaining safe walking services), and has served as a consultant and contributing author for the Occupational Safety and Health Administration (OSHA) in the creation and revision of their standards regarding "Walking and Working Surfaces"). (See, Mr. Kendzior's CV, attached as "**Exhibit A**").

4.    Defendant has filed its Motion to Exclude Kendzior, wherein Defendant's main assertion is that Mr. Kendzior's opinions in this case are unreliable because he did not conduct an in-person inspection of the scene of the accident and did not perform any testing. Defendant further advises this Court that Mr. Kendzior has been disqualified in another slip and fall case where he did not conduct an in-person inspection of the scene, which Defendant asserts is analogous to the issues present in this case and should serve as a basis for

excluding Mr. Kendzior's testimony here.

5.    More specifically, as detailed by Defendant in paragraph 7 of its Motion to Exclude, Defendants have singled out the following opinions delivered by Mr. Kendzior in this case:

    a.    That Plaintiff slipped and fell on moisture located on the Vinyl Composition Tile (VCT), located outside of Defendant's walk-in-cooler;

    b.    That spilled milk and other contaminants within and around the subject cooler was a chronic problem known by Defendant which demanded their attention and remediation, and that Defendant should have inspected the area in and in front of their refrigerated cooler displays more frequently as to ensure that they were safe and dry; and

    c.    That Defendant should have used an appropriate floor matting outside of the subject cooler where Plaintiff fell, and further should have adequately warned Plaintiff as to the impending wet floor hazard.

6.    In reciting the opinions delivered by Mr. Kendzior, Defendants omit several critical opinions, including but not limited to Mr. Kendzior's opinion that Defendant's having their milk rack set back approximately two feet into the walk-in cooler, requiring customers wishing to retrieve milk to step into the cooler, was an unsafe practice. Mr. Kendzior is also presenting opinions not commented on by Defendant regarding proper procedures for inspecting and maintaining hazard free walkways.

7.    Contrary to Defendant's assertions, the above detailed opinions which Defendant does address are based on the only possible methodology by which any expert could reliably deliver such opinions, namely all known and available historical information pertaining to

the nature of the subject cooler and the presence of moisture and liquids in and around the same. While Defendant cites to the exclusion of Mr. Kendzior's testimony in the case of *Alsip v. Wal-Mart Stores E., LP*, and asserts that his exclusion in that case for not performing an in-person inspection is analogous to the facts and issues present here, Defendant's assertions regarding the same are completely misleading and irrelevant.

## **MEMORANDUM OF LAW**

Pursuant to Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.
>
> Fed.R.Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the U.S. Supreme Court laid out the standard for determining the admissibility of expert testimony under Rule 702. See 509 U.S. 579, 592-93 (1993). Following *Daubert*, the Eleventh Circuit Court of Appeals acknowledges a "rigorous three-part inquiry" when determining the admissibility of expert testimony under Rule 702. See *Frazier*, 387 F.3d at 1260. In *Frazier*, the court outlined what the trial courts must consider when making a determination to exclude expert testimony. "[T]rial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the

evidence or to determine a fact in issue." Id. (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

In addressing the second prong regarding reliability of an experts opinions, which is the grounds on which Defendant asserts that Mr. Kendzior's opinions should be excluded, the law is clear that an expert may offer an opinion based principally upon his own experience and knowledge, so long as the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Clena Investments, Inc. v. XL Speciality Ins. Co.*, 280 F.R.D. 653, 663 (S.D. Fla. 2012).

## <u>ARGUMENT</u>

I. <u>**The exclusion of Mr. Kendzior in the *Alsip* case is wholly irrelevant to this case, as the allegations at issue in that case, and likewise the opinions offered by Mr. Kendzior in that case, are completely and fully distinguishable from the allegations and opinions at issue in this case.**</u>

As detailed by Defendant in pages 5-6 of its Motion to Exclude, and as reflected in Defendant's exhibits D and E to its Motion to Exclude, the issues in *Alsip v. Wal-Mart Stores E.*, centered around a slip and fall that took place on a wet outdoor painted walkway. Specifically, the documents filed by Defendant show that the plaintiff in the *Alsip* case was walking through an outdoor parking lot in the rain, and slipped on a painted cross walk. At primary issue in that case was whether the paint rendered the crosswalk unreasonably slippery when wet. Mr. Kendzior was retained, and presented testimony opining that the painted surface was unreasonably slippery when wet, and further that the paint did not contain an anti-slip additive. Notwithstanding the fact that

these opinions were clearly scientific in nature, Mr. Kendzior offered these opinions without performing the scientific testing (e.g. coefficient of friction testing) which admittedly would have been required to reach the opinions at issue. Accordingly, Mr. Kendzior's opinions were excluded, which frankly appears on the surface to have been the proper ruling in that case.

This case, however, is completely distinguishable from *Alsip* because Mr. Kendzior's opinions delivered in this case are not scientific in nature, and do not require any type of scientific testing or personal inspection to provide. Specifically, unlike in *Alsip* where the primary issue was the slipperiness of the painted surface when wet here, according to Mr. Kendzior's unrefuted (and clearly qualified) opinion, the VCT flooring which Plaintiff slipped on "must remain dry at all times and presents a significant slip hazard when wet" (See, Mr. Kendzior's report dated June 29, 2018, attached here as "**Exhibit B**"). That co-efficient of friction testing is not at issue in this case is reinforced by the fact that Defendant's expert, Mr. Ketchum, also did not perform any such testing.

As such, per Mr. Kendzior's opinion regarding the nature of VCT tile - which opinion was not challenged in any form by Defendant's expert Mr. Reginald Tall - the slipperiness of Defendant's tile when wet is not at issue; instead, what is at issue in this case is a determination of whether or not the tile was wet, a determination of whether or not Defendant was on notice of an ongoing conditions which would cause the tile to regularly be wet – to wit, a tracking of contaminants from inside the cooler to outside the cooler through regular foot traffic in and out of the cooler - and a determination of what steps Defendant should have taken had it known of such an issue.

Accordingly, whereas there was a scientific issue (i.e. a determination of the slipperiness of a painted surface) in *Alsip*, here, there is only a purely factual / historical issue (i.e. was the floor

wet). As such, unlike in *Alsip*, Mr. Kendzior's opinions in this case are not scientific, cannot be tested scientifically, and moreover cannot be determined from any site inspection occurring even a day after an incident (let alone close to two years after).

Accordingly, the exclusion of Mr. Kendzior's opinions in the *Alsip* case are completely distinguishable and irrelevant to his opinions presented in this case.

**II.** **Mr. Kendzior's first opinion that Plaintiff slipped and fell on moisture located on the Vinyl Composition Tile located outside of Defendant's walk-in-cooler is unquestionably reliable as it is based wholly on all of the known and available evidence regarding the incident.**

As described above, one of the central issues in this case is a purely factual / historical inquiry as to whether or not the floor where Plaintiff slipped was wet at the time she slipped on it. As also described above, despite Defendant's assertions to the contrary, this is a purely factual / historical inquiry which no scientific testing or subsequent scene inspections could have illuminated.

Instead, in providing this opinion, Mr. Kendzior relied on the only information and evidence known and available in this case, namely review of the CCTV footage, review of the photographs taken at the scene of the incident, and review of the testimony of Plaintiff and Defendant's store manager, Ronald Bennett. While Defendant, in its Motion to Exclude, cites to misleading and/or out-of-context excerpts from the testimony of Plaintiff and Ronald Bennet, a plain reading of those depositions, along with a careful review of the CCTV footage, leaves absolutely no doubt that Plaintiff did, in fact, slip and fall due to moisture / liquid on the floor. Specifically,

- According to Plaintiff's unrefuted testimony, when she retrieved milk from the subject walk in cooler prior to falling on the floor directly outside of the cooler, the floor within the cooler – which she had to step into to retrieve the milk – was wet with condensation and/or milk. (Noftz, p. 41, lines 15-22);

- Significantly, Defendant's manager, Ronald Bennet, testified that he never looked in the cooler and can't state whether the cooler floor was or was not wet at the time of this incident. (Bennet, p. 85, lines 11-21). Furthermore, as admitted by Defendant's expert, Mr. Ketchum, there is no evidence or other testimony which would refute Plaintiff's assertion regarding the floor in the cooler being wet. (Ketchum, p. 51, lines 14-25).

- Moreover, immediately after slipping and falling, as she was lying on the floor in immeasurable pain with a clearly broken leg, Plaintiff was able to appreciate that she had slipped on something wet, and was able to feel a wetness on her leg. (Noftz, p. 62, line 5 through p. 63, line 9).

- This much is admitted by Defendant's store manager, Mr. Bennet, who also specifically recalls Plaintiff stating, as she was laying on the floor with a broken leg, that she had slipped as a result of the floor being wet. (Bennet, p. 83, lines 4-10).

Accordingly, in conjunction with his review of the CCTV and photographic evidence, the above testimony establishes beyond any doubt that Plaintiff did, in fact, slip and fall as a result of the floor in Defendant's store being wet. In the absence of being present on the date of the incident and being able to fully document the scene, Mr. Kendzior's threshold opinion regarding this issue is based on the totality of all historical information known and available, and thus is the product of reliable methodology.

**III.**     **Mr. Kendzior's second opinion that spilled milk and other contaminants within and around the cooler was a chronic problem known and required to be remediated by Defendant is also unquestionably reliable as it too is based wholly on all known and available evidence regarding these historical conditions.**

The second primary opinion of Mr. Kendzior which Defendant takes issue with on grounds of reliability is that spilled milk and other condensation within and around the cooler was a chronic problem known by Defendant, which required Defendant to address and remediate same. Similar to the previous opinion, this too is not a scientific opinion, but instead is an opinion derived wholly from the historical information and evidence known and available in this case which no scientific testing or subsequent scene inspections could have shed led on.

Moreover, despite Defendant's argument to the contrary, the record evidence in this case, which formed the basis of Mr. Kendzior's opinions, clearly does establish that there was this chronic problem of condensation and wetness on the floor of the walk in cooler, as follows:

- In his deposition, Defendant's store manager Mr. Bennet testified as follows:

    o   that milk stored within the subject freezer was often delivered semi-frozen, so that as it defrosted in the rack, and in the crates kept in the back of the cooler, condensation would drip down onto the floor of the cooler. (Bennett p. 98-99);

    o   that there were often small leaks within the milk cartons which would cause milk to drip down onto the floor of the subject cooler (Bennett, p. 55-56); and

    o   that Defendant was "not cleaning [the coolers good enough]", and that Mr. Bennet failed to implement and adhere to CVS's policies requiring the coolers to be cleaned on a weekly basis. (Bennett p. 56; p. 137-138);

- Crucially, in December of 2015, approximately 10 months prior to Plaintiff's subject incident, the Florida Department of Agriculture and Consumer Services inspected Defendant's store and subject cooler, and issued Defendant a citation for: "FLOOR IN WALK IN COOLER HAS BUILD UP OF SPILLS AND DEBRIS". (Emphasis supplied)(see citation attached as "**Exhibit C**").

Moreover, it is important to understand that the testimony and record evidence in this case irrefutably establishes that there was regular and heavy traffic in and out of the walk-in-cooler, which would have tracked any moisture and wetness on the floor of the cooler to the VCT tile directly outside of the cooler, as follows:

- The subject cooler where the milk is stored is a walk-in cooler which serves as an access point to the remainder of the numerous coolers located within Defendant's store. (Bennet, p. 23, lines 2-20);

- That the milk is stored on a rack which is often pushed back several feet into the cooler (as it was on the date of Plaintiff's incident), requiring customers to step into the cooler to retrieve milk, and is also regularly pulled outside of the cooler onto the adjacent tile area where Plaintiff fell. (Bennet, p. 39, line 20 through p. 41, line 18).

- Any time an employee or vendor wishes to load merchandise into any of the remaining coolers, they must enter through the cooler containing the milk. (Bennet, p. 24, lines 13-24);

- The coolers were loaded with merchandise up to ten times a day. (Bennet, p. 25, lines 8-18);

- When milk was on sale, such as the date of this incident, there could be very heavy traffic

in the cooler both from customers purchasing milk and CVS' efforts in restocking the same. (Bennet, p. 29, line 16 through p. 31, line 19).

Accordingly, the above testimony establishes beyond any doubt that there was an ongoing issue with the presence of moisture and wetness on the floor of the subject cooler, which Defendant knew or should have known about. Accordingly, Mr. Kendzior based his above detailed opinion on the entirety of the available materials, namely the historical information establishing the conditions present in conjunction with his own expert opinion as to the steps needed to remediate the conditions present. Accordingly, there is again no doubt that this opinion is the product of reliable methodology.

**IV.** **Mr. Kendzior's third opinion that Defendant should have provided an appropriate floor matting in the area outside of the subject cooler, along with a warning, is also reliable as it is derived from all known and available evidence regarding the historical condition of the cooler area, together with Mr. Kendzior's undeniable expertise as to the propriety of floor mattings and warnings.**

The third and final primary opinion of Mr. Kendzior which was addressed by Defendant on grounds of reliability is Mr. Kendzior's opinion that Defendant should have provided an appropriate floor matting in the area outside of the subject cooler, along with a warning. Again, this is not a scientific opinion which would require Mr. Kendzior to perform testing and physically inspect the scene. Instead, based on review of all record evidence establishing the likelihood and potential for wetness and moisture on the floor of the cooler, together with the testimony establishing the regularity with which people were walking in and out of the subject cooler, Mr.

Kendzior is merely providing his more than qualified opinion that a floor mat outside of the cooler, along with a warning, would have been appropriate remediation steps for Defendant to have taken.

In support of this opinion, Mr. Kendzior cited to numerous nationally recognized standards, such as ATSM F-1637-13, entitled "Standard Practice for Safe Walking Surfaces" and ANSI A1264.2-2012, entitled "American National Standard for the Provision of Slip Resistance on Walking/Working Surfaces", which clearly state the need for matting and warnings in the environment at issue here. Accordingly, there is again no doubt that Mr. Kendzior's above opinion is reliable.

## CONCLUSION

Defendant has asserted Mr. Kendzior's above detailed opinions by asserting that they are unreliable because Mr. Kendzior did not perform any scientific testing nor did he inspect the scene of the incident in person. In making these assertions, Defendants overlook the simple fact that Mr. Kendzior's opinions which Defendant takes issue with in the Motion to Exclude are opinions which cannot be scientifically tested, and which any subsequent site inspection would have been irrelevant in forming. Instead, Mr. Kendzior, has merely opined that based on all of the historical evidence and information available in this case, he believes that Plaintiff slipped and fell on a wet floor, that the floor in the area where Plaintiff fell being wet was a longstanding issue which Defendant knew or should have known about, and that in light of that information, Defendant should have implemented certain safety precautions, such as floor matting and a warning sign. Mr. Kendzior is one of the – if not the single - foremost experts in maintain safe walking surfaces, and as such is undoubtedly qualified to render these opinions.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the forgoing document is being served this day on all counsel of record or pro se parties who have appeared in this matter via Electronic Mail to: Gavin Mackinnon, Esquire, KELLEY KRONENBERG, P.A. (Counsel for Defendant gmackinnon@kelleykronenberg.com), on this 25th day of April, 2019.

THE ROUSSO LAW FIRM
9350 South Dixie Highway
Suite 1520
Miami, Florida 33156
(305) 670-6669

By:      /s/ *Darren J. Rousso, Esq.*
Darren J. Rousso, Esq.
Florida Bar No.: 0097410
Darren@roussolawfirm.com
SERVICE EMAIL:
Pleadings@roussolawfirm.com

# EXHIBIT A



# Russell J. Kendzior, WACH, RAS

P.O. BOX 92628
Southlake TX 76092
(817) 749-1705
safety@verizon.net

**Services:** Expert Witness Services Specializing in Slips, Trips, and Falls, Including: Walkways, Ramps, Curbs, Parking Lots, Sidewalks, Floor Matting, Bathtubs, and Footwear.

**Profile:** Internationally recognized as a leading expert specializing in slip, trip and fall cases.

**Professional Experience:** Over 25 years of experience in the field of slip, trip and fall prevention, litigation support.

**Professional Affiliations:**
- Founder and President of the National Floor Safety Institute (NFSI)
- Former Member of the Board of Delegates of the National Security Council
- Committee Secretary, NFSI B101 Committee on "Safety Requirements for Slip, Trip and Fall Prevention"
- Member of nine ASTM committees
- Professional Member of the American Society of Safety Engineers (ASSE)
- Professional Member of the American Association of Mechanical Engineers (ASME)
- Member of the Association of Certified Fraud Examiners (ACFE)
- Licensed Registered Accessibility Specialist (TAS)

**Publications:**
- *"Floored! Real-Life Stories from a Slip and Fall Expert Witness"* (2017)
- *"Falls Aren't Funny"* (2010)
- *"Slip and Fall Prevention Made Easy"* (1999)
- A.M. Best's Safety Directory "OSHA Self-Inspection Checklist: Walking & Working Surfaces"
- Past Columnist, Professional Retail Store Maintenance Magazine (PRSM)
- Past Columnist, Attorney at Law Magazine (Dallas Edition)
- Contributing Author of numerous trade periodicals including Chain Store Age, Occupational Health and Safety, ISSA Today, Texas Lawyer and various industry newsletters
- Featured authority in numerous newspaper and magazine articles including the New York Times and the Wall Street Journal
- Interviewed for numerous radio and television broadcasts including: "Good Morning America", ABC News "Inside Edition", "What Would You Do", Sirius Radio, and PBS
- OSHA, ADA/TAS, and IBC/ICC expert

**Cases:** Has been retained as an expert witness in more than 800 slip, trip and fall cases representing both Plaintiffs and Defendants. An updated case list is available upon request.

# EXHIBIT B



P.O. Box 92628
Southlake, TX 76092
Phone: (817) 749-1705
Fax:    (817) 749-1702

Russell J. Kendzior
russ@tractionexperts.com

June 25, 2018

Mr. Darren Rousso
The Rousso Law Firm
9350 South Dixie Highway Suite. 1520
Miami, FL 33156

### Re: Peggy Noftz vs. Holiday CVS, LLC., d/b/a CVS Pharmacy #476

Dear Mr. Rousso;

Please accept the following as my report as it relates to the above captioned case. In preparing this report I have read the letter to the Defendant by the law firm of Darren J. Mr. Rousso dated November 16, 2016, the Deposition of Ms. Peggy Noftz (Plaintiff) and, the Plaintiff's Answers to Defendant's First Set of Interrogatories to Plaintiff. I have also reviewed the State of Florida's Department of Agriculture and Consumer Services Division of Food Safety Food Safety Inspection Report dated December 26, 2015, the U.S. FDA Public Food Code (2013), the Defendant's store surveillance video depicting Ms. Noftz's slip and fall event along with photographs of the location where Ms. Noftz slipped and fell. I am awaiting the Deposition transcript from the Defendant's store manager Mr. Ron Bennett and reserve the right to amend this report upon receipt.

### Background

Based on Ms. Noftz's deposition testimony it is my understanding that on October 30, 2016 Ms. Noftz was an invited guest of the Defendant's CVS retail store #4799 which is located at 2105 13th Street in St. Cloud, Florida. As Ms. Noftz was walking the aisle adjacent to the refrigerated milk display she slipped on a "milky" liquid substance which was on the floor which caused her to fall and in-turn break her leg. Ms. Noftz was walking at a normal pace prior to engaging the spilled liquid and was unaware that such liquid was present in advance of her fall. It is my further understanding that there were no warning signs posted at or near the location of Ms. Noftz's slip-and-fall event.

The floor inside the cooler was made of concrete while the floor outside of the cooler was made of polished Vinyl Composition Tile (VCT). Ms. Noftz had previously stepped on moisture located within the cooler and did not slip. She later returned to the milk cooler and slipped and fell on moisture located on the exterior VCT. Ms. Noftz was wearing a pair of flip-flops at the time of her fall which were in good condition.

### Nationally Recognized Industry Consensus Standards

The American Society of Testing and Materials (ASTM) F-1637-13 entitled "Standard Practice for Safe Walking Surfaces" (enclosed) describes the standard of care by which users of floors are to be used and maintained. Listed below are the sections of the ASTM F-1637-09 standard, which I believe are relevant in this case.

1

Section 5.1.3 requires that: "*Walkway surfaces shall be slip resistant under expected environmental conditions and use.*"

Section 5.1.4 states that: "*Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.*"

Section 5.4 "*Mats and Runners*": Sub-section 5.4.1 states that: "*Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather.*"

Section 5.4.3 requires that: "*Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations.*"

The American National Standards Institute (ANSI) has a published standard number entitled A1264.2-2012 "American National Standard for the Provision of Slip Resistance on Walking/Working Surfaces" which is was in effect at the time of Ms. Noftz's slip-and-fall event.

Section 7. "*Floor Mats and Runners*" Sub-section 7.1 "*Location*" requires that: "*Floor mats and/or runners or other appropriate methods, shall be at building entries and in areas where it may be foreseen that operations may encounter contaminants on floor surfaces that are not considered sufficiently slip resistant.*"

Section 8. "*Housekeeping*", Sub-section 8.1 "*General*" requires that: "*A housekeeping program shall be implemented to maintain safe walking-working surfaces. E8.1 A written housekeeping program is recommended to ensure consistency and quality. The program should describe materials, equipment, scheduling, methods, and training of those conducting housekeeping.*"

Section 8.4 "*Supervision*" states that: "*The housekeeping conditions shall be monitored and a person(s) shall be authorized to promptly initiate corrective action(s).*

Sub-section 8.4.1 states that: "*Monitoring of areas shall include:*
        *a. Inspecting all walking surfaces;*
        *b. Promptly notifying persons responsible for cleanup of affected conditions;*
        *c. Placing signage, barriers or personnel until cleanup is complete.*"

Section 9. "*Warnings*" Sub-section 9.1 "*General*" requires that: *"A warning shall be provided whenever a slip/fall hazard has been identified until appropriate corrections can be made of the area barricaded. E9.1 Slip/trip hazards should be eliminated by design and arrangement of possible. The next priority is to guard the hazard if possible, and the last priority is to warn of a hazard. The intent is to eliminate and/or reduce, as much as possible, the potential for injury*

The above-named standards emphasize the importance of protecting pedestrians from slip hazards presented by improper housekeeping, supervision, and warnings and serves as the standard of care for the retail industry.

## Opinions

It is my opinion that the Defendant failed to properly maintain, inspect, and safeguard the aisle in question and in failing to do such, exposed Ms. Noftz to an un-necessary and otherwise preventable slip hazard.

In her deposition Ms. Noftz described her slip and fall event as: "*Yeah. Parked the car, got in. Walked in the store, grabbed a cart, walked over to the coolers where they keep the milk and that, and opened up the door to the cooler, and kind of noticed the floor was a little wet, but that the shelving was pushed back like a good two feet. I mean, you had to step in and reach to get the milk and that stuff. So, the floor seemed a little wet, but I went ahead and stepped in and got the milk. Put it in the cart. I walked over to get the Coke products, put them in the cart, and back to get my husband's pills, but noticed that I didn't have my debit card, so I just turned around. I was going to leave the cart in the middle of the floor, but I didn't want to leave the milk sitting out, because I didn't want it getting warm and then somebody just putting it back in the cooler, and then, you know, that just takes down the date on the milk. And as I stepped back to open up the cooler door, my foot slipped basically in the same spot that I came out of and that. And then I felt my leg twist, and as I was going down, I just yelled for somebody to call 911; that I had broke my leg, and then I fell to the floor.*" Ms. Noftz further stated that: "*the floor was wet "in front of the cart. Like could have been like condensation or, you know, maybe, you know sometimes the milk leaks and the stuff."*

Slip and fall accidents are a leading cause of guest injuries in the retail store industry, and although the Vinyl Composition Tile (VCT) floor as used at the CVS's store in question is customarily in the retail industry, such flooring material must remain dry at all times and presents a significant slip hazard when wet. It is also the industry standard to immediately correct any known hazards once they have been identified. To ensure that their floors are always safe, retailers publish both safety policies and procedures as well as employee training guides which call for timely and frequent floor inspections, spill cleanup, and details the overall importance of preventing slips and falls. Unfortunately, at this time I have not been provided the Defendant's safety policies and procedures nor any training materials and therefore cannot affirm that the Defendant has such documents.

Based on the evidence provided to me at this time it appears that the Defendant was aware that the floor both inside and outside of their refrigerated display cases would frequently become wet from a leaking merchandise (ie: milk) and or condensation but failed to take the necessary steps to ensure that such potential slip hazards be contained and or prevented.

Ms. Noftz stated that the milk display rack was pushed back approximately two feet in the refrigerator and required that she step into the cooler to retrieve a milk container. Such practice is uncommon and unsafe. The milk rack should not have been pushed back into the refrigerator but rather pulled forward as to not require customers to enter the refrigerator where spilled milk or other moisture may be present. The Defendant knew, or should have known, that the floor both inside and in front of the refrigerated display may from time to time become wet due to spilled milk or condensation and therefore were on notice as to the increased likelihood that the floor in that area has a greater likelihood of being wet than that of aisles where liquids are not merchandised. However, knowing of the elevated slip risk of a spilled liquid (ie: milk) the Defendant should have inspected the area in and in front of their refrigerated displays more frequently as to ensure that they were safe and dry.

The Florida Department of Agriculture and Consumer Services Division of Food Safety Food Safety Inspection Report stated that "Floor in walk in cooler has build up of spills and debris." Such "build up" is a direct violation of section 6-501.12 and 6-501.13 "Cleaning, Frequency and Restrictions" of the U.S. FDA Public Health Code. This documented call for corrective action by the health department was dated December 28, 2015 nearly one year prior to Ms. Noftz's slip

and fall event. Therefore, spilled milk may have been a chronic problem known by the Defendant which demanded their attention and remediation.

Also, given the likelihood that milk and or condensation may accumulate in front of their refrigerated displays the Defendant should have used an appropriate type of floor matting in front of the refrigerators as to absorb/contain spilled liquids (ie: milk) which from time to time accumulate in front of the refrigerators as to cause a potential slip hazard.

Another failure on the part of the Defendant CVS was their failure to adequately warn Ms. Noftz as to the impending wet floor hazard. Because caution signs were not posted at or near the location where Ms. Noftz slipped and fell, Ms. Noftz was not adequately warned as to the impending slip hazard.

It is my opinion that the Defendant failed to meet the nationally recognized industry standards listed above and in doing so, allowed an otherwise known wet floor hazard to exist thus exposing their customers to a potential slip-and-fall event. Had the Defendants addressed the above-mentioned walkway hazard prior to Ms. Noftz visit, it is unlikely that she would have slipped and fallen, and in-turn injured herself. It is therefore my conclusion that the Defendant CVS failed to provide a reasonably safe walkway and therefore failed in their duty to protect their invited guests from un-necessary harm caused by a hazardous walkway and was directly responsible for Ms. Noftz's injuries. I reserve the right to amend my opinions as new information may be presented to me in the future.

Regards,

Russel J. Kendzior, WACH, RAS
President

.encl

4



**Designation: F1637 − 13**

An American National Standard

# Standard Practice for
# Safe Walking Surfaces[1]

This standard is issued under the fixed designation F1637; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

1.2 Conformance with this practice will not alleviate all hazards; however, conformance will reduce certain pedestrian risks.

1.3 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]
F1646 Terminology Relating to Safety and Traction for Footwear

## 3. Terminology

3.1 See Terminology F1646 for the following terms used in this practice:
3.1.1 Bollard,
3.1.2 Carpet,
3.1.3 Cross slope,
3.1.4 Element,
3.1.5 Fair,
3.1.6 Footwear,
3.1.7 Foreseeable pedestrian path,
3.1.8 Planar,
3.1.9 Ramp,
3.1.10 Sidewalk,
3.1.11 Slip resistance,
3.1.12 Slip resistant,
3.1.13 Walkway,
3.1.14 Walkway surface hardware, and

## 4. Significance and Use

4.1 This practice addresses elements along and in walkways including floors and walkway surfaces, sidewalks, short flight stairs, gratings, wheel stops, and speed bumps. Swimming pools, bath tubs, showers, natural walks, and unimproved paths are beyond the scope of this practice.

## 5. Walkway Surfaces

5.1 *General:*
5.1.1 Walkways shall be stable, planar, flush, and even to the extent possible. Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3.
5.1.2 Walkway surfaces for pedestrians shall be capable of safely sustaining intended loads.
5.1.3 Walkway surfaces shall be slip resistant under expected environmental conditions and use. Painted walkways shall contain an abrasive additive, cross cut grooving, texturing or other appropriate means to render the surface slip resistant where wet conditions may be reasonably foreseeable.
5.1.4 Interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use.

5.2 *Walkway Changes in Level:*
5.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.
5.2.2 Changes in levels up to ¼ in. (6 mm) may be vertical and without edge treatment. (See Fig. 1.)
5.2.3 Changes in levels between ¼ and ½ in. (6 and 12 mm) shall be beveled with a slope no greater than 1:2 (rise:run).
5.2.4 Changes in levels greater than ½ in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

[1] This practice is under the jurisdiction of ASTM Committee F13 on Pedestrian/ Walkway Safety and Footwear and is the direct responsibility of Subcommittee F13.50 on Walkway Surfaces.
Current edition approved Aug. 1, 2013. Published August 2013. Originally approved in 1995. Last previous edition approved in 2010 as F1637 – 10. DOI: 10.1520/F1637-13.
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States

Copyright by ASTM Int'l (all rights reserved); Wed Sep 11 09:56:56 EDT 2013
Downloaded/printed by
Russell Kendzior (NFSI) pursuant to License Agreement. No further reproductions authorized.



**FIG. 1 Changes in Levels up to a Maximum of ¼ in. (6 mm)**

### 5.3 *Carpet:*

5.3.1 Carpet shall be maintained so as not to create pedestrian hazard. Carpet shall be firmly secured and seams tightly maintained. Carpet shall not have loose or frayed edges, unsecured seams, worn areas, holes, wrinkles or other hazards that may cause trip occurrence.

5.3.2 Carpet on floor surfaces shall be routinely inspected. Periodic restretching may become necessary. Periodic inspection is particularly important at step nosing edges.

5.3.3 Carpet and carpet trim (as measured when compressed) shall meet the transition requirements of 5.2.

5.3.4 Shag-type carpet shall not be used on stair treads. Carpeting should be firmly secured onto the tread and around the nosing.

### 5.4 *Mats and Runners:*

5.4.1 Mats, runners, or other means of ensuring that building entrances and interior walkways are kept dry shall be provided, as needed, during inclement weather. Replacement of mats or runners may be necessary when they become saturated.

5.4.2 Building entrances shall be provided with mats or runners, or other means to help remove foreign particles and other contaminants from the bottom of pedestrian footwear. Mats should be provided to minimize foreign particles, that may become dangerous to pedestrians particularly on hard smooth floors, from being tracked on floors.

5.4.3 Mats or runners should be provided at other wet or contaminated locations, particularly at known transitions from dry locations. Mats at building entrances also may be used to control the spread of precipitation onto floor surfaces, reducing the likelihood of the floors becoming slippery.

5.4.4 Mats shall be of sufficient design, area, and placement to control tracking of contaminants into buildings. Safe practice requires that mats be installed and maintained to avoid tracking water off the last mat onto floor surfaces.

5.4.5 Mats, runners, and area rugs shall be provided with safe transition from adjacent surfaces and shall be fixed in place or provided with slip resistant backing.

5.4.6 Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences.

### 5.5 *Illumination:*

5.5.1 Minimum walkway illumination shall be governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES) (Application and Reference Volumes).

5.5.2 Illumination shall be designed to be glare free.

5.5.3 Illumination shall be designed to avoid casting of obscuring shadows on walkways, including shadows on stairs that may be cast by users.

5.5.4 Interior and exterior pedestrian use areas, including parking lots, shall be properly illuminated during periods when pedestrians may be present.

5.6 *Headroom*—A minimum headroom clearance of 6 ft 8 in. (2.03 m), measured from the walkway surface, shall be provided above all parts of the walkway. Where such clearance is not provided in existing structures, the low clearance portions of the walkway shall be safely padded, marked with safety contrast color coding and posted with appropriate warning signs.

### 5.7 *Exterior Walkways:*

5.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.

5.7.1.1 Exterior walkways shall be slip resistant.

5.7.1.2 Exterior walkway conditions that may be considered substandard and in need of repair include conditions in which the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked to the extent that pieces may be readily removed.

5.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 5.2.

5.7.3 Edges of sidewalk joints shall be rounded.

## 6. Walking Surface Hardware

6.1 Walking surface hardware within foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; variances between levels shall be transitioned in accordance with 5.2.

6.2 Walking surface hardware within foreseeable pedestrian paths shall be maintained slip resistant.

6.3 Walking surface hardware shall be installed and maintained so as to be stable under reasonable foreseeable loading.

## 7. Stairs

### 7.1 *General:*

7.1.1 Stairways with "distracting" forward or side views shall be avoided. A "distracting" view is one which can attract the stair user's attention, (for example, advertisements, store displays), thus distracting the stair user.

7.1.2 Step nosings shall be readily discernible, slip resistant, and adequately demarcated. Random, pictorial, floral, or geometric designs are examples of design elements that can camouflage a step nosing.

7.1.3 Doors shall not open over stairs.

7.1.4 Structure (reserved).

### 7.2 *Short Flight Stairs (Three or Fewer Risers):*

7.2.1 Short flight stairs shall be avoided where possible.

7.2.2 In situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting are examples of some appropriate warning cues.

Copyright by ASTM Int'l (all rights reserved); Wed Sep 11 09:56:56 EDT 2013<br>Downloaded/printed by<br>Russell Kendzior (NFSI) pursuant to License Agreement. No further reproductions authorized.

## 8. Speed Bumps

8.1 Design to avoid the use of speed bumps.

8.2 All speed bumps which are in foreseeable pedestrian paths shall comply with 5.2 (walkway changes in level).

8.3 Existing speed bumps, that do not conform to 5.2, shall be clearly marked with safety color coding to contrast with surroundings. Painted speed bumps shall be slip resistant. Pedestrian CAUTION signs are recommended.

## 9. Wheel Stops

9.1 Parking lots should be designed to avoid the use of wheel stops.

9.2 Wheel stops shall not be placed in pedestrian walkways or foreseeable pedestrian paths.

9.3 Wheel stops shall be in contrast with their surroundings.

9.4 Wheel stops shall be no longer than 6 ft (1.83 m) and shall be placed in the center of parking stalls. The minimum width of pedestrian passage between wheel stops shall be 3 ft (0.91 m).

9.5 The top of wheel stops shall not exceed 6.5 in. (165 mm) in height above the parking lot surface.

9.6 Adequate illumination shall be maintained at wheel stops as governed by the requirements of local codes and ordinances or, in their absence, by the recommendations set forth by the Illuminating Engineering Society of North America (IES-Application and Reference Volumes).

9.7 Bollards, not less than 3 ft 6 in. (1.07 m) height, may be placed in the center of parking stalls as an alternative to wheel stops. Bollards should be appropriately marked to enhance visibility.

## 10. Gratings

10.1 Gratings used in public areas should be located outside of pedestrian walkways.

10.2 Gratings located in foreseeable pedestrian walkways shall not have openings wider than ½ in. (13 mm) in the direction of predominant travel.

10.2.1 *Exemption*—The requirements of 10.2 do not apply in areas where footwear worn is controlled (for example, industrial areas).

10.3 Gratings with elongated openings shall be placed with the long dimension perpendicular to the direction of predominant travel.

10.4 Gratings shall be maintained slip resistant.

## 11. Warnings

11.1 The use of visual cues such as warnings, accent lighting, handrails, contrast painting, and other cues to improve the safety of walkway transitions are recognized as effective controls in some applications. However, such cues or warnings do not necessarily negate the need for safe design and construction.

11.2 When relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users. Bright yellow is a commonly used color for alerting users of the presence of certain walkway conditions. When properly applied and maintained, other colors can also provide effective warnings.

## 12. Keywords

12.1 carpet; floors; gratings; mats; runners; sidewalks; short flight stairs; slip resistance; speed bump; stairs; walkway; wheel stop

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).

Copyright by ASTM Int'l (all rights reserved); Wed Sep 11 09:56:56 EDT 2013
Downloaded/printed by
Russell Kendzior (NFSI) pursuant to License Agreement. No further reproductions authorized.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

*ANSI/ASSE A1264.2 – 2012*



# AMERICAN NATIONAL STANDARD

*ANSI/ASSE A1264.2 – 2012*
*Provision of Slip Resistance*
*on Walking/Working Surfaces*



AMERICAN SOCIETY OF
SAFETY ENGINEERS

provide proper lighting for safety.

**6.1.1** Transitions between bright and dark areas (and vice-versa) should be as gradual as possible, allowing time for eyes to adjust to change in lighting.

**6.1.2** Lighting design must:

**6.1.2.1** Minimize instances of shadows, which can obscure hazardous conditions and floor transitions.

**6.1.2.2** Avoid creating glare, which can temporarily impair vision increasing the potential for falling.

**6.1.2.3** Not depend on a single lighting unit, which if inoperable can result in poor light levels.

**E6.1.2.3** Use of redundant lighting systems is recommended.

**6.1.2.4** Consider that older populations require greater levels of lighting than younger populations, due to reduced visual acuity that develops with age.

## 7. FLOOR MATS AND RUNNERS

Mats and runners, or other comparable alternatives, shall be used when walking surfaces do not meet the guideline set forth in Section E12.2 of this standard.

**E7** See ASTM F1637, *Standard Practice for Safe Walking Surfaces.* Mats and/or runners placed at appropriate locations to help remove contaminants (e.g., oils, solvents, water, dusts, sand, gravel, soil, flour) from the bottoms of footwear and help keep the floor in a clean and dry condition. As a rule of thumb, footprints or water prints should not be seen on the floor beyond the last mat of an installation.

**7.1 Location.** Floor mats and/or runners, or other appropriate methods, shall be at building entries and in areas where it may be foreseen that operations may encounter contaminants on floor surfaces that are not considered sufficiently slip resistant.

**E7.1** Examples of areas which may benefit from mat installation include: machinery process areas; areas adjacent water fountains; food counters and food preparation areas; adjacent drink stations; under and around sinks at ice stations and freezers/coolers; near machinery and other areas where spills may occur.

**7.2 General Design.** Floor mats designed for removal of dust, dirt and moisture from the footwear bottom and

**E7.2** Mats should be constructed with a slip resistant backing (to prevent sliding of the mat) and a minimal height profile (see

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

Larger mats tend to remain in place better than a smaller mat due to greater weight and larger dimensions.

**7.4 Installation.** Mats shall be installed so that they do not create tripping hazards. Mats and runners that are not recessed shall have a beveled or graduated edge or other appropriate treatment to help reduce the possibility of tripping on the mat edge.

**E7.4** Vertical edges of mats and runners should not be greater than 1/4 inch. Abrupt vertical edges greater than 1/4 inch up to 1/2 inch should be beveled at a slope no greater than 1:2. Abrupt vertical changes greater than 1/2 inch should not be permitted.

**7.4.1 Layout.** Mats and runners shall be laid out to avoid overlap or gaps between them to provide a continuous walkway path.

**7.5 Inspection and Maintenance.** Mats and runners shall be routinely inspected and adequately maintained to identify and correct conditions such as buckling, edge curling and other defects. Damaged mats shall be promptly replaced.

**E7.5** Routine inspections will quickly identify and help prioritize issues/problems related to adequate securement, contaminant saturation level, curling, buckling and rippling, displacement and other potentially hazardous conditions. Immediate remediation is recommended when a potentially hazardous condition is observed.

**7.6 Storage and Care.** Procedures shall be established for the placement, maintenance, inspection and storage of mats in accordance with manufacturer's instructions. In the absence of such instructions, mats and runners shall be stored in a way that allows them to lie flat when in use.

**E7.6** Storage procedures should be in conformance with manufacturers specifications. Also see Section 8: Housekeeping.

Note: In the context of Section 7.6, flat means there is no buckling, rippling or curling of the mat edges when it is laid out.

**7.7 Cleaning and Trade-Out.** To maintain effective soil pick-up and track-control, and slip resistance, mats shall receive scheduled cleanings or trade-out of appropriate frequency based on the conditions to which they are subject.

**E7.7** According to CRI's manual for school facilities, "Walk-off mats should be cleaned frequently. Once a walk-off mat becomes filled with soil, the soil will then transfer to the soles of shoes and spread throughout the facility."

## 8. HOUSEKEEPING

**8.1 General.** A housekeeping program shall be implemented to maintain safe walking-working surfaces.

**E8.1** A written housekeeping program is recommended to ensure consistency and quality. The program should describe materials, equipment, scheduling, methods and training of those conducting housekeeping.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

**8.2    Maintenance Procedures.** Written procedures, if in place, shall specify cleaning and maintenance procedures including immediate response, routine operations, remedial measures and reporting requirements.

**E8.2**    Procedures should be reviewed regularly and updated as needed so that an effective program is maintained. Drains should be kept clear and free flowing. Certain spills involving hazardous chemicals may be subject to regulatory reporting.

Periodic slip resistance testing of floor surfaces can be of value in the following situations:

- If a treatment or coating has been applied to the floor surface which may deteriorate over time.
- To monitor for floor cleanliness.
- There is no available history of slips and falls at the facility.
- To evaluate prospective flooring materials prior to installation.

**8.3    Training.** Housekeeping staff, contractors and other persons with the responsibility of a given area shall be trained in:

a. Inspection, maintenance and cleaning requirements;
b. Inspection, maintenance and cleaning procedures;
c. Safe handling and disposal of chemicals and/or solutions;
d. Safe operations of maintenance and cleaning equipment;
e. Emergency conditions and operations;
f. Recordkeeping and reporting relating to housekeeping and maintenance.

**E8.3**    Under the Hazard Communication Act (HAZCOM) workers may be subject to the Hazard Communication Act (HAZCOM) if exposed to certain chemicals.

For more information about training, consult ANSI/ASSE Z490.1, *Accepted Practices for Safety, Health and Environmental Training.*

**8.4    Supervision.** The housekeeping conditions shall be monitored and a person(s) shall be authorized to promptly initiate corrective action(s).

**E8.4**    An effective program requires employees to identify and report potential hazards to appropriate supervision. Documentation of monitoring can assist in identifying hazards (e.g., areas where repeated spills occur), which will permit better planning and anticipation of such events.

**8.4.1    Monitoring.** Monitoring of areas shall include:

**E8.4.1**    See Section 9: Warnings.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

a. Inspecting all walking surfaces.
b. Arranging for prompt notification of persons responsible for clean up of hazardous conditions.
c. Placing signage, barriers or personnel until clean up is complete.

**8.5    Use of Granular Absorbents.** The use of granular absorbents where processes or the environment creates slip hazards shall be acceptable treatment in reducing slip hazards where other control methods are not feasible. The absorbent shall be swept up and replaced before the absorbent has been fully saturated.

## 9.    WARNINGS/BARRICADES

**9.1    General.** A warning shall be provided when a slip or trip hazard has been identified until appropriate corrections can be made or the area barricaded.

**E9.1**    Slip/trip hazards should be eliminated by design and arrangement if possible. The next priority is to guard the hazard if possible, and the last priority is to warn of a hazard. The intent is to eliminate and/or reduce, as much as possible, the potential for injury.

**9.1.1    Alternate Route.** When a slip/fall hazard covers an entire walkway, making it difficult to safely route personnel around the hazard, barricades shall be used to limit access (see Section 10.1). If appropriate, assign a person(s) to detour pedestrians in conjunction with the appropriate use of warning signs until the barricade can be erected or the hazard removed.

**9.2    Signage.** The signage reference for warning signs used for slip/fall hazards shall be ANSI Z535.2, *Standard for Environmental and Facilities Safety Signs.*

**E9.2**    The ANSI Z535 standards provide for the design, application and use of signs and placards in creating a uniform visual alert system. They are available from the NEMA (The Association of Electrical Equipment and Medical Imaging Manufacturers), 1300 North 17th Street, Arlington, Virginia or at the website: http://www.nema.org/.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

**9.3     Symbols.** Warning signs using symbols shall use ANSI Z535.3, *Criteria for Safety Symbols.*

**9.4     Placement.** Warning signs shall be placed at approaches to, or around, areas where slip/fall hazards are forseeable. These devices shall surround or be placed around the perimeter of the hazardous area to clearly demarcate the location of the potential hazard.

**9.4.1     Unmitigated Hazards.** In cases where hazards cannot be mitigated, warning signs and barricades shall be used to reroute traffic.

E9.4.1     Warning signs may be ineffective for the control of slip and fall hazards in areas where routing pedestrian traffic around the hazard is difficult to accomplish, such as where the danger lies on a shorter path than the safe route. In such instances, barricading the area in conjunction with appropriate warning signs to reroute employee traffic to an entirely different route may be required.

Barricades and warning signs should be used in hazardous areas. See Section 10: Inherently Slippery Environments for details on the use of barricades.

**9.4.2     Removal of Hazard.** When the hazard has been eliminated or controlled, the sign and/or barricade shall be promptly removed.

E9.4.2     Leaving signage/barricades after hazardous conditions have been remediated can lead to complacency.

**10.     INHERENTLY SLIPPERY ENVI-RONMENTS**

In inherently slippery environments, an effective combination of multiple controls shall be implemented.

E10     Examples of inherently slippery environments include chemical processes, food processing and rendering and other operations likely to result in liquid contamination of walking/working surfaces. Training of persons to safely use such areas is highly recommended. The use of the procedures outlined in Section 8 are recommended as minimum training guidelines.

**10.1     Barricades.** Barricades shall be used to isolate processes in hazardous areas. They shall also be used to isolate slip hazards from pedestrian traffic.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

**10.2     Containment.** Where spills, leakage or other emissions are anticipated, provisions shall be made to contain the spillage away from the walkway.

**10.3     Authorized Entry.** In certain inherently slippery areas, only employees who are properly trained and equipped shall be authorized to enter.

**10.4     Signage Considerations.** Signage for inherently slippery environments shall be in place in accordance with Sections 9.2, 9.3 and 9.4 of this standard.

**11.     SELECTION AND/OR TREATMENT**

**11.1     Safely Maintained.** Walking surfaces for use in accordance with 2.3 shall be safely maintained.

**11.2     Practical Considerations.** Where it is not practical to replace flooring, etching, scoring, grooving, brushing, appliqués, coatings and other such techniques shall be used to achieve acceptable slip resistance under foreseeable conditions.

**E10.2**     Examples of containment include proper drainage, scupper curbing, dikes, drip pans and operational enclosures. Some barricades may be methods of containment.

**E10.3**     Processes may have to be shut down for special cleanup operations. Equipment may include full personal protective equipment, lifelines, harnesses and/or special footwear. See Appendix A for slip-resistant footwear considerations.

**E11**     Reference to ASTM F802, *Standard Guide for Selection of Certain Walkway Surfaces When Considering Footwear Traction*. Consideration should be given towards replacement of the flooring with a different material having more pronounced surface asperities. Textured surface coatings are a viable selection alternative. The material selection should be determined based upon testing of the surface with an appropriate slip testing device.

**E11.2**     Surfacing applications and/or treatments are available that can impart increased slip resistance to problem surfaces. Some flooring surfaces can be enhanced by etching. Certain paint-on or trowel-on applications can enhance slip resistance. It is important to select one that will adhere tenaciously to the substrate. Cleanability and durability should be considered. Patch testing of prospective materials in the problem environment is recommended before proceeding with broad application. Carpeting is also an option worthy of consideration for control of slips.

This is an ASSE-produced standard. It is copyright protected and may not be reproduced or distributed to any other party.

# EXHIBIT C



Florida Department of Agriculture and Consumer Services
Division of Food Safety

# FOOD SAFETY INSPECTION REPORT

Chapter 500, Florida Statutes
(850) 245-5520

Print Date: December 28, 2015

**ADAM H. PUTNAM**
**COMMISSIONER**

Visit # 1219-0209-21
Bureau of Food and Meat Inspection
Attention: Records Section
3125 Conner Boulevard, C-26
Tallahassee, FL 32399-1650

| | |
|---|---|
| Food Entity Number: | 279725 |
| Food Entity Name: | CVS PHARMACY # 04799 |
| Date of Visit: | December 28, 2015 |
| Food Entity Address: | 2105 13th ST Saint Cloud, FL 34769 - 4206 |
| Food Entity Mailing Address: | 1 Cvs DR Woonsocket, RI 02895-6146 |
| Food Entity Type/Description: | 152/ Minor Outlet with Perishables |
| Food Entity Owner: | HOLIDAY CVS LLC   MAIL DROP 23062A  (CVS) |

Owner Code:   CVS

## OVERALL RATING - PASSED

On December 28, 2015, CVS PHARMACY # 04799 was inspected by MICHAEL OURS, a representative of the Florida Department of Agriculture and Consumer Services and the Overall Sanitation Rating was PASSED.

## PERMIT APPLICATION INFORMATION

Permit Application Information was verified with management.

## COMPLIANCE KEY

IN = In Compliance  OUT = Not In Compliance  N/O = Not Observed  N/A = Not Applicable

## FOODBORNE ILLNESS RISK FACTORS AND PUBLIC HEALTH INTERVENTIONS

| Violation Number | Compliance Status | Violation Description |
|---|---|---|
| 1 | IN | Supervision: Person in Charge present, demonstrates knowledge, and performs duties |
| 2 | IN | Employee Health: Management, food employee and conditional employee; knowledge, responsibilities and reporting |
| 3 | IN | Employee Health: Proper use of restriction and exclusion |
| 4 | IN | Good Hygienic Practices: Proper eating, tasting, drinking, or tobacco use |
| 5 | N/A | Good Hygienic Practices: No discharge from eyes, nose, and mouth |
| 6 | IN | Preventing Contamination by Hands: Hands clean and properly washed |
| 7 | N/A | Preventing Contamination by Hands: No bare hand contact with ready-to-eat foods or approved alternate method properly followed |
| 8 | OUT | Preventing Contamination by Hands: Adequate handwashing sinks, properly supplied and accessible |
| 9 | IN | Approved Source: Food obtained from approved source |
| 10 | N/O | Approved Source: Food received at proper temperature |
| 11 | IN | Approved Source: Food in good condition, safe and unadulterated |
| 12 | N/A | Approved Source: Required records available: shellstock tags, parasite destruction |
| 13 | IN | Protection from Contamination: Food separated and protected |
| 14 | N/A | Protection from Contamination: Food-contact surfaces: cleaned and sanitized |



DEPOSITION EXHIBIT
E
Kendzior; 2|27|



Florida Department of Agriculture and Consumer Services
Division of Food Safety

## FOOD SAFETY INSPECTION REPORT

Chapter 500, Florida Statutes
(850) 245-5520

Print Date: December 28, 2015

**ADAM H. PUTNAM**
**COMMISSIONER**

Visit # 1219-0209-21
Bureau of Food and Meat Inspection
Attention: Records Section
3125 Conner Boulevard, C-26
Tallahassee, FL 32399-1650

Food Entity Number:    279725
Food Entity Name:    CVS PHARMACY # 04799
Date of Visit:    December 28, 2015

## FOODBORNE ILLNESS RISK FACTORS AND PUBLIC HEALTH INTERVENTIONS

| Violation Number | Compliance Status | Violation Description |
|---|---|---|
| 15 | IN | Protection from Contamination: Proper disposition of returned, previously served, reconditioned, and unsafe food |
| 16 | N/A | Potentially Hazardous Food Time/Temperature: Proper cooking time and temperature |
| 17 | N/A | Potentially Hazardous Food Time/Temperature: Proper reheating procedures for hot holding |
| 18 | N/O | Potentially Hazardous Food Time/Temperature: Proper cooling time and temperatures |
| 19 | N/A | Potentially Hazardous Food Time/Temperature: Proper hot holding temperatures |
| 20 | IN | Potentially Hazardous Food Time/Temperature: Proper cold holding temperatures |
| 21 | N/A | Potentially Hazardous Food Time/Temperature: Proper date marking and disposition |
| 22 | N/A | Potentially Hazardous Food Time/Temperature: Time as a public health control: procedures and records |
| 23 | N/A | Consumer Advisory: Consumer advisory provided for raw or undercooked foods |
| 24 | N/A | Highly Susceptible Populations: Pasteurized Foods, Prohibited Re-service, and Prohibited Foods* |
| 25 | N/A | Chemical: Food additives: approved and properly used |
| 26 | IN | Chemical: Toxic substances properly identified, stored, and used |
| 27 | N/A | Conformance with Approved Procedures |

## GOOD RETAIL PRACTICES

| Violation Number | Compliance Status | Violation Description |
|---|---|---|
| 37 | OUT | Prevention of Food Contamination: Contamination prevented during food preparation, storage & display - |
| 53 | OUT | Physical Facilities: Physical facilities installed, maintained, and clean |

## OBSERVATIONS AND CORRECTIVE ACTIONS

COS = Corrected on Site

### INSPECTION: RISK BASED

**BACK ROOM AND RELATED AREAS**

| Violation Number | Citation Description | Observation | COS |
|---|---|---|---|
| 8. | Signs or posters notifying food employees to wash hands not provided at all handwashing sinks. 6-301.14 | NO SIGN POSTED IN MEN'S TOILET ROOM. | ☐ |



Florida Department of Agriculture and Consumer Services
Division of Food Safety

# FOOD SAFETY INSPECTION REPORT

Chapter 500, Florida Statutes
(850) 245-5520

Print Date: December 28, 2015

**ADAM H. PUTNAM**
**COMMISSIONER**

Visit # 1219-0209-21
Bureau of Food and Meat Inspection
Attention: Records Section
3125 Conner Boulevard, C-26
Tallahassee, FL 32399-1650

Food Entity Number: 279725
Food Entity Name: CVS PHARMACY # 04799
Date of Visit: December 28, 2015

······································································································································

### INSPECTION: GRP

## BACK ROOM AND RELATED AREAS

| Violation Number | Citation Description | Observation | COS |
|---|---|---|---|
| 37. | Food not stored in a clean, dry location, not at least 6" above the floor; or subjected to contamination. 3-305.11 | FOOD ITEMS STORED ON FLOOR IN BACKROOM. | ☐ |
| 53. | Physical facilities cleaning not done as often as necessary to keep them clean or during periods when the least amount of food is exposed such as after closing. 6-501.12 | FLOOR IN WALK IN COOLER HAS BUILD UP OF SPILLS AND DEBRIS. | ☐ |

······································································································································

## COMMENTS

## ACKNOWLEDGMENT

I acknowledge receipt of a copy of this document, and I further acknowledge that I have verified the location and mailing addresses on the first page of this document are correct, or I have written the correct information on the first page of this document.

_____
(Signature of FDACS Representative)

MICHAEL OURS, SANITATION AND SAFETY SPECIALIST

_____
(Signature of Representative)

Ron BENNETT

Print Name and Title